UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-1:07CR053 ERW |
| | ) | |
| DEVIN C. WILSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant

to 28 U.S.C. §636(b). The Defendant filed a motion to suppress evidence, and an evidentiary hearing

was held on July 17, 2007. Subsequently, a transcript and the post-trial memoranda of the parties

were filed in this matter. On September 27, 2007, the undersigned held a status hearing at which the

Defendant, Defendant's counsel, and Government's counsel were present. At the hearing, the

Defendant, the Defendant's counsel, and Government's counsel stated that because of Judge

Blanton's absence, they agreed and wished to have the matter submitted to the undersigned. In

addition, the Government moved to reopen the pretrial motion hearing, and the undersigned set a

supplemental hearing on October 16, 2007. At the hearing, the parties argued the Government's

motion to reopen the matter, and the undersigned granted the motion and heard further testimony on

the motion to suppress.

Based upon the evidence adduced at the hearing on July 17, 2007, the transcript of that

proceeding, as well as the supplemental evidence presented on October 16, 2007, the undersigned

makes the following findings of fact and conclusions of law:

**Findings of Fact**

Tony Jones is the Assistant Chief of the Caruthersville, Missouri police department. On September 2, 2006, he and other officers received a 911 emergency dispatch sometime after 8 p.m. to go to 801 West Eighth Street, Apt. B, in the City of Caruthersville to investigate a possible kidnapping. When Jones arrived at this address, two patrolman were talking to the victim of the kidnapping who he determined was a sixteen-year old female named Kristin Walker. Jones also talked briefly to the female who told him she had been kidnapped by the Defendant Devin Wilson in Oklahoma City, Oklahoma, and was forced to leave with him, being transported apparently in his vehicle to the State of Missouri. She also told officers that the Defendant forced her to engage in acts of prostitution after they arrived in the State of Missouri.

Shortly after the officers' arrival at 801 West Eighth Street, the Defendant drove up in a bronze or copper-colored Cadillac with Oklahoma license plates, and Walker pointed to the Defendant and stated that he was the person who had kidnapped her. The officers, at that point, arrested the Defendant for kidnapping, and Assistant Chief Jones went to the prosecuting attorney's office in Caruthersville to make out an application to search 801 West Eighth Street in order to obtain evidence of the kidnapping.

Jones also called Officer Tina Cook of the Caruthersville Police Department to come to the police station to conduct a detailed interview of the 16-year old female victim. Cook arrived at the station for the interview shortly after the telephone call, and started to interview Walker at about 9:40 p.m. with the interview lasting approximately forty-five minutes. The victim stated that the Defendant had come to her house in Oklahoma City, forced her to pack her clothes, and forced her to go to the State of Missouri with him. Once in the State of Missouri, the Defendant forced the victim to work

2

for him as a prostitute.  Cook also verified that the victim was sixteen years old on the date of the kidnapping, and that she resided in Oklahoma City.  The victim also said that the Defendant forced her to have sex with another female and videotaped this activity using a video camera which she said the Defendant kept at 801 West Eighth Street on the floor in the front room of the house.  She said that the videocassette or 8 mm film packet which the Defendant used to record this encounter was still in the camera.

The victim also said that the Defendant used his cell phone, which was a camera phone, to tape her performing oral sex on a male, and that the Defendant was still in possession of this phone. In addition, the victim said that the Defendant kept ecstasy pills and crack cocaine, which he had offered to her, in the house.  She believed that these pills and cocaine could be found in a closet on the first floor.  The victim also stated that the Defendant kept a handgun in the apartment, and this was, to the best of her knowledge, in the closet on the first floor.  In addition, the victim stated that her clothing and personal possessions were in all areas of the house, and were also in the bronze-colored Cadillac vehicle in which the Defendant was arrested.  When Cook found out about these items being in the house from her conversation with the victim, she would call Jones at the prosecuting attorney's office and report what Walker had told her so Jones could use this information in preparing the search warrant.   Jones was with the prosecuting attorney Mike Hazel preparing an application and affidavit for a warrant to search 801 West Eighth Street, Apt. B, and the Defendant's bronze or copper-colored Cadillac automobile.  After the complaint and affidavit were typed, but before they were sworn to by Jones, Hazel added in handwriting, information on the warrant and the affidavit that the victim had told Cook about her clothes and pills being in the house and in the car.

Sometime apparently after 10:30 p.m., Jones went before Judge Currie of the Pemiscot County Circuit Court, and swore to the complaint and affidavit requesting the search of 801 West Eighth Street, Apt. B, Caruthersville, Missouri, and the Defendant's 1996 Cadillac Seville, bearing Oklahoma license plate 674 XHL. The affidavit and complaint sworn to in support of the search warrant states in pertinent part as follows:

On the evening of September 2, 2006, members of the Caruthersville Police Department were called to 801 West Eighth Street in Caruthersville, Missouri, by a sixteen-year old female who told the dispatcher that she was from Oklahoma and was kidnapped and held against her will and forced to stay at 801 West Eighth Street, Apt. B. When officers arrived at the residence, the female was standing outside of the residence and got into the officers' police car. She again told the officers that she had been kidnapped in Oklahoma City, and as the Defendant drove up in his vehicle, told the officers that that was the person who had kidnapped her. This person also told the officers that the Defendant, Devin Wilson, had come to her house in Oklahoma City, forced her to get her clothing from the house, and forced her to get into his vehicle and leave with him. Once in Missouri, she said that she and another female named Jessica Williams were forced to "prostitute themselves," and forced to work at a strip club. She stated that while in Caruthersville, the Defendant threatened and forced her to stay in the residence located at 801 West Eighth Street, Caruthersville, Missouri. She also stated that Devin Wilson, on more than one occasion, used red and blue ecstasy pills and crack cocaine and offered them to the victim Kristin Walker. Further, Kristin Walker told officers that her bags and clothing are in Devin Wilson's residence at 801 West Eighth Street, as well as the Defendant's previously described Cadillac automobile.

4

Based on the affidavit, Judge Currie issued a warrant to search the above residence and the vehicle for Walker's bags, clothing, and controlled substances to include ecstasy and crack cocaine.

After obtaining the warrant, the officers executed the warrant at about 11:30 p.m. Just prior to executing the warrant, Officer Cook, who was also involved in the execution of the warrant, briefed the officers as to the information Kristin Walker had given her about the items in the house. Specifically, she told them about the video camera and videotape, the gun, the narcotics, and the cell phone. As soon as entry was made into the apartment by the use of a key, Officer Cook observed the video camera lying in the open on the floor in the front room of the house. When she saw the camera, Cook believed it contained evidence of the crime of photographing or taping a minor in sexual activity as well as evidence that would corroborate the victim's story of the kidnapping. She therefore seized the video camera, opened it, and found a tape inside which she also believed contained evidence of the kidnapping and child pornography charges, and, therefore, seized the 8 mm tape also. While this was occurring, other officers were searching the house for drugs, clothing, and other items of evidence. Specifically, Sgt. Michael Coleman searched the downstairs closet of the apartment, seizing a loaded .380 caliber Cobra handgun which he found in a shoe box. Because Coleman was aware that the Defendant was a convicted felon and it was unlawful for him to possess the gun, Coleman believed that the weapon was evidence of a crime. After seizing the gun, Coleman continued to search the closet for ecstasy or cocaine, but was unable to locate the drugs in this area. The search of other areas of the house lead to the seizure of numerous items of clothing and personal belongings of the victim, and a plastic bag--a baggie--believed to contain cocaine residue.

Assistant Chief Jones searched the Defendant's copper or bronze-colored Cadillac. In the front open area of the Cadillac, Jones found a cellular telephone which he recognized to be a camera

phone. As he picked up the phone, it powered on or he powered it on, and Jones observed a female having oral sex with a male on the front screen of the phone. He flipped open the phone and observed other pornographic photos on the screen on the inside of the phone. Jones seized the phone because he was aware it was a camera phone based on the victim's statement to Officer Cook that the Defendant had photographed her with a phone in forced sexual encounters, Jones believed it to be evidence of the kidnapping and other crimes.

Herbert Stapleton is an agent with the Federal Bureau of Investigation ("FBI"). On April 16, 2007, Stapleton was in possession of a federal arrest warrant to arrest the Defendant for the crime of being a felon in possession of a firearm. On that date, he went to 801 West Eighth Street, Apt. B, the residence of the Defendant, and arrested the Defendant just inside the living room of his apartment in the area at the bottom of the stairs. When arresting the Defendant in this location, he observed in plain view in the same room, a Samsung video camera that matched perfectly the description of the camera from which the videotape had been previously seized on September 2, 2006. Stapleton had viewed photographs of the Samsung video camera and believed it to be one in the same camera. At the time he saw the camera in the apartment, he was investigating not just a felon in possession of a firearm charge against the Defendant, but also production of child pornography against the Defendant. Because of this, he believed that the Samsung camera would be valuable evidence in the child pornography case and seized it because it was in his plain view.[1]

---

[1] The former girlfriend of Assistant Chief Jones, who is the mother of his children and the current girlfriend of the Defendant also testified at the hearing. She stated that when she was at the Caruthersville Police Department at a date after the execution of the search warrant, Jones showed her the pictures in the Defendant's cell phone and told her that is what her "boyfriend was like." Jones denied this conversation. Although this conflicting testimony may or may not affect the chain of custody as to the introduction of the phone at trial, it took place, if at all, long after the search and seizures at issue in the case now at bar, and does not affect the undersigned's findings in this matter.

**Conclusions of Law**

A.  The Search of 801 West Eighth Street, Apt. B

Based on the above findings, the undersigned concludes that sufficient probable cause exists to authorize the issuance of a warrant to search the above address.  For a search warrant to be valid, it must be based upon a finding  by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched.  Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967).  The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, . . .however, as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules."  See Illinois v. Gates, 462 U.S. 213, 232 (1983).  Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."  Illinois v. Gates, at 232.  Probable cause may be based on the totality of the circumstances present.  All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched.  See

---

In addition, the victim did not personally inform Jones about the contents of the phone, the camera, the videotape, or the existence of the gun, but instead told Officer Tina Cook about these items during their forty-five minute interview at the police station on the night of the search.  Indeed, Cook and another officer and not Chief Jones recovered the camcorder, videotape, and the gun.

Illinois v. Gates, supra. Also, affidavits should not be read in a hyper-technical manner. See United States v. Ventresca, 380 U.S. 102 (1965).

Further, even an anonymous tip from a crime stopper's hotline or a statement from a member of the community, who is known but whose reliability has not been tested, is sufficient information upon which to create probable cause as long as there is sufficient factual basis provided by the person, and their statement is otherwise shown to be reliable through the corroboration of even innocent detail. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

In United States v. Allen, 279 F.3d 790 (8th Cir. 2002), the informant, who had no prior record of reliability, told the agents that the informant and the defendant were involved together in the production of methamphetamine, had purchased pseudoephedrine the night before, and the defendant had materials used in the production of methamphetamine stored in his house. He described the defendant's house, told him what cars were parked out in front, and told him the owner of one of the vehicles, and said the defendant was a felon. The only information verified or corroborated of the informant's statements was the address of the house and the owner of one of the vehicles outside the premises. In holding the affidavit sufficient, the Court stated as follows:

> Taken together, we believe the information contained in the search warrant affidavit created a fair probability that law enforcement officers would discover further evidence of illegal drug activity at Allen's residence. The fact that Allen had twenty soda cylinders and thirty lithium batteries in his possession and that he had spent the night with Craycraft buying ephedrine/pseudoephedrine pills and looking for anhydrous ammonia establish probable cause to believe that Allen had methamphetamine manufacturing equipment and ingredients at his residence. . . As to Craycraft's credibility, even though he had no record as an informant, the information he provided was sufficiently credible both because his statements were against his penal interest because the police were able to corroborate some of the information he provided. See United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001) (corroboration of minor innocent details can support probable cause; informant made statements against penal interests after being caught with drugs by police).

United States v. Allen, 297 F.3d 790, 794, 795.  See also United States v. Underwood, 364 F.3d 956 (8th Cir. 2004) (agent could assess informant's credibility because information given in person; location of house given confirmed by independent investigation; officer had received previous tips from hotline about drug activity at the location).

As stated above, either an informant or witness who provides information to police in a face-to-face encounter is deemed more reliable than an anonymous informant.  See United States v. Underwood, supra, (the agent could assess the informant's credibility because information was provided in person).  See also Florida v. J.L., 529 U.S. 266, 276 (2000) (Kennedy, J. concurring) (if an informant places his anonymity at risk, the court can consider this factor in weighing the reliability of the tip).

In United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), police officers were approached on the street by a woman who told them that she lived at 309 Canal Street, and also that the officers needed to investigate the drugs and the guns that "the guys" had on the porch two doors down from her at 401 Canal Street.  She appeared to be inebriated and demanded that the officers investigate the complaint, and did not give her name but did give officers the address where she lived.  The officers went to the house and saw three men on the porch.  The officers advised the suspects they were investigating drug and gun activity and asked them if they were armed.  They denied being armed, and the officers conducted a pat down search of defendant Christmas first finding a loaded handgun. Christmas was placed under arrest for this and searched incident to the arrest with the officers finding a large amount of crack cocaine on his person.  In holding this procedure legal, the Court stated as follows:

> . . .Two aspects of the encounter supported the credibility of the informant's report.
> The first was the close proximity of the informant's residence to the illegal activities

at 401 Canal Street. It was reasonable for Officer Smith to conclude that a woman living two doors from 401 Canal Street would know if drugs were being dealt from the porch there. Second, the informant's proximity to 401 Canal Street at the time she spoke with Officer Smith further bolstered her credibility. By informing the police about her neighbors' illegal activity, the informant exposed herself to the risk of reprisal. . . Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements. As the Supreme Court has observed, citizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints. See Illinois v. Gates, 462 U.S. 213, 233-34, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). . . Here the informant provided her home address to the officers. In doing so, the informant exposed herself to the repercussions of misleading or deceiving the police.

All of these factors make information provided in this case more trustworthy and reliable than the anonymous tip in J.L. Indeed, courts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters.

222 F.3d 141, 144.

Given the above, the undersigned concludes that the affidavit states sufficient probable cause to search the apartment and the car. In the case now at bar, Kristin Walker personally called the police department, stated she had been kidnapped and held against her will, and stated she was at 801 West Eighth Street, Apt. B. When the officers arrived at that location, Walker was standing outside the residence and told them in detail of her kidnapping by the Defendant who she named, and stated she was held against her will at 801 West Eighth Street in Caruthersville, Missouri. She further detailed that she was forced to go to St. Louis where she was forced to commit acts of prostitution for the benefit of the Defendant, and while in the house was offered ecstasy pills and crack cocaine by the Defendant. In addition, when the Defendant arrived in his vehicle, she pointed out the Defendant as the person who had kidnapped her. According to the affidavit and complaint, the officers were able to verify the fact that the Defendant lived at 801 West Eighth Street in Caruthersville, Missouri, and that the vehicle in which he was arrested belonged to him. Given the

above, the undersigned concludes as in Christmas, supra, the witness provided firsthand information to officers of her capture. She was a victim in the case, and was willing to disclose her identity to police and make statements to them implicating the Defendant in her kidnapping, and stating that her clothes as well as drugs were kept by the Defendant inside the apartment and in the car. The officers were able to corroborate her story to the extent that she was in the location where she said she was located at the Eighth Street address, and were able to determine that the Defendant lived at the address. This was as much corroboration as existed in Allen, supra, and as in Christmas, supra. The witness provided detailed information including her name and subjected herself to the filing of a false police report. As in Christmas, supra, this was sufficient indicia of reliability to find probable cause to search the apartment and car for her clothes and the cocaine and any other items which might be found that would be evidence of the kidnapping during the course of that search.

B. Seizure of the Gun, Videotape and Cell Phone

The undersigned concludes that the seizure of the above items was lawful because the items were in plain view during the execution of the warrant to search for drugs and personal belongings of the victim.

The plain view doctrine allows law enforcement officers to seize evidence when 1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence can be plainly viewed; 2) the object's incriminating character is immediately apparent, and 3) the officer had a lawful right of access to the object itself. See United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997).[2]

---

[2] The first and third elements of the plain view doctrine are corollaries of each other and are related. The "lawful right to access" stems from the proposition that an officer must have access to the object by way of a search warrant or other exigent circumstances in a manner that he is able to

One example of the plain view doctrine occurs when officers while executing a valid search warrant find incriminating evidence not detailed in the search warrant. As long as this other evidence is discovered while the officers are searching areas in which the named items can be concealed, the first element of the plain view doctrine is met, that is that the agent or officer is lawfully at a place where the property can be plainly observed. In so holding, the Supreme Court stated as follows in <u>Horton v. California</u>:

> An example of the applicability of the 'plain view' doctrine is a situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.

<u>Horton v. California</u>, 496 U.S. 128, 135 (1990).

Similarly, the Eighth Circuit Court of Appeals in <u>Khabeer v. United States</u>, 410 F.3d 477 (8th Cir. 2005) held as follows:

> The Khabeers next argue that the police violated their Fourth Amendment rights by seizing evidence that was not particularly described in the warrant. . .The government responds that the search was authorized by the warrant, and that the evidence was seized in accordance with the plain view exception to the Fourth Amendment's warrant requirement. "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object." <u>United States v. Bustos-Torres</u>, 396 F.3d 935, 944 (8th Cir. 2005).
>
> We conclude that the search of the home was proper. The officers had a right to be in the Khabeer residence by virtue of the search warrant. Because the identity card in the name of Mary Anne Dawkins, one of the objects specified in the warrant, is a small object, the officers were authorized to search all areas in the residence that could conceal an identification card. Many of the disputed identification documents and credit card reports, including the Dawkins military identification, were found in a box in the master bedroom closet. The remainder of the identification cards were seized from a box in the utility room. Although the Khabeers argue that the officers should have stopped searching small areas once they found the Dawkins identification

seize the object.

card, there was uncontested evidence that the documents in the utility room were found before the discovery of the Dawkins card and other documents in the master bedroom.

United States v. Khabeer, 410 F.3d 477, 482.

The second element of the plain view doctrine is that the incriminating nature of the object to be seized must be "immediately apparent" to the officer viewing the object. The seminal case in defining the meaning of "immediately apparent" is Texas v. Brown, 460 U.S. 730 (1983). In defining "immediately apparent" the Court stated as follows:

> But the Court of Criminal Appeals, as we have noted, felt the state's case ran aground on the requirement that the incriminating nature of the items be "immediately apparent" to the police officer. To the Court of Appeals, this apparently meant that the officer must be possessed of near certainty as to the seizable nature of the items. Decisions by this Court since Coolidge indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine. . .Plainly, the court did not view the "immediately apparent" language of Coolidge as establishing any requirement that a police officer " know" that certain items are contraband or evidence of a crime. Indeed, Colorado v. Bannister, supra, was merely an application of the rule set forth in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) that "[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity*." Id. at 587, 100 S.Ct., at 1380 (emphasis added). We think this statement of the rule from Payton, supra, requiring probable cause for seizure in the ordinary case is consistent with the Fourth Amendment and we reaffirm it here.

Texas v. Brown, 460 U.S. 730, 741, 742.

In United States v. Weinbender, supra, the state court issued a warrant to search the defendant's premises for a windbreaker, a pair of shorts, tennis shoes, and a baseball cap containing a logo. During the search for the above items, an officer discovered a piece of metal pipe which he at first thought was a pipe bomb, but later learned was a homemade silencer for a pistol. The defendant was charged by indictment in federal court with unlawful possession of a silencer. The

defendant challenged the seizure of the items stating that the incriminating nature of the silencer was not immediately apparent. In upholding the seizure of the silencer, the Court stated as follows:

> When Officer Schmit pulled the first metal object from its resting spot along the I-beam, he believed it was a pipe bomb. He later learned the object was part of a homemade silencer. "The 'immediately apparent' requirement means that officers must have 'probable cause to associate property with criminal activity.'" United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150, 116 S.Ct. 1026, 134 L.Ed.2d 105 (1996). . . "Probable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" Id. (quoting Garner, 907 F.2d at 62. . .
>
> Here, the incriminating character of the object was immediately apparent to Officer Schmit. The possession of either a pipe bomb or a homemade silencer is illegal. The fact that the item turned out to be a silencer, instead of a pipe bomb, did not vitiate probable cause. . .Thus, the seizure of the homemade silencer was justified under the plain view doctrine.

United States v. Weinbender, 109 F.3d 1327, 1330, 1331.

Further, the discovery of incriminating evidence during the execution of the search warrant need not be inadvertent. An officer may be aware that items other than those named in the search warrant will probably be found on the premises and be on the lookout for these items, even though the officer neglected to ask for inclusion of the items in the search warrant. In Horton v. California, 496 U.S. 128 (1990), a police officer in San Jose, California was investigating the robbery of a coin dealer who had just finished working as a treasurer at a coin show. The dealer was accosted by two masked men, one carrying a machine gun, the other carrying a stun gun. The police officer developed probable cause to search the defendant Horton's house for the proceeds of the robbery and for the weapons. The warrant issued by the magistrate judge authorizing the search of the premises, however, called for the search of the house for the proceeds of the robbery including the jewelry but not for the weapons. The detective testified that while he was searching for the jewelry, he was also

keeping a close lookout for the weapons. During the search, the detective did not find the jewelry or the proceeds of the robbery, however, discovered and seized an Uzi submachine gun, two stun guns, a revolver and a handcuff key. In upholding the search the Court stated as follows:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined to an area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant. Specification of the additional item could only permit the officer to expand the scope of the search. On the other hand, if he or she has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first. . .

> In this case, the scope of the search was not enlarged in the slightest by the omission of any reference to the weapons in the warrant. Indeed, if the three rings and other items named in the warrant have been found at the outset-or if petitioner had them in his possession and had responded to the warrant by producing them immediately- no search for weapons could have taken place. . .

> In this case the items seized from petitioner's home were discovered during a lawful search authorized by a valid warrant. When they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence. He had probable cause not only to obtain a warrant to search for stolen property, but also to believe that the weapons and handguns had been used in the crime he was investigating. The search was authorized by the warrant; the seizure was authorized by the "plain-view" doctrine.

Horton v. California, 496 U.S. 128, 138, 139, 141-42.

In addition the fact that the videotape and the phone may have needed to be further examined at a later date to determine their full contents did not make their evidentiary value any less immediately apparent at the time they were seized by the officers. In Skokos v. Rhoades, 440 F.3d 957 (8th Cir. 2006), police officers in Arkansas seized the defendant's countertop video machines on which patrons of his establishment could play video games, but on which they could also play video

poker and blackjack. They were seized by officers because they were in plain view and because the prosecuting attorney had told them that the machines were likely illegal. The defendant challenged the seizure because he claimed that it was not immediately apparent that the machines were illegal. He claimed this because the machines needed to be further examined and tested to determine their legality after their seizure. In upholding this seizure, the Court stated as follows:

> The plaintiffs argue that the illegal nature of the countertop machines was not immediately apparent. They cite to both Arizona v. Hicks, 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), and Minnesota v. Dickerson, 508 U.S. 366, 378-79, 113 S.Ct. 3130, 124 L.Ed.2d 334 (1993), for the proposition that a warrantless search may not be justified under the plain-view exception where the police must manipulate the object to verify that it is contraband. Messrs. Skokos and Chapman contend that because the machines were subjected to later testing, it was not immediately apparent to the officers that the machines were contraband. Such uncertainty, according to the plaintiffs, prevented the police from relying on the plain-view doctrine and caused the warrantless seizures to be unreasonable.
>
> As the city defendants point out, however, the term "immediately apparent" does not really means what it seems to say. The plaintiffs would have us require near certainty before a plain-view seizure could occur. But the Supreme Court has rejected that proposition, and in fact has said "that the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary." Texas v. Brown, 460 U.S. 730, 741, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). For an item's incriminating character to be immediately apparent, the police merely need probable cause to believe that the item is contraband. . .
>
> Here, the police had probable cause to believe that the countertop machines were contraband. They relied on Mr. Rhoades's legal opinion, which, as we noted above, was reasonable when offered. When the officers saw machines meeting Mr. Rhoades's criteria, therefore, they were justified in seizing them as contraband.

440 F.3d 957, 961.

In United States v. Albers, National Park Service rangers searched a boat belonging to the defendants because they had probable cause to believe that the boat contained evidence of the illegal activity of "BASE jumping" in the national park. During the search of the boat, they observed

videotapes and films, some of which were labeled "Throw Mama from the Plane," "BASE Jump Copy," and "Bungi BASE Jump." They knew from their experience that BASE jumpers often videotape their illegal activities, and that this was consistent with a camera on board the boat. The Court held that this evidence showed probable cause to seize the videotapes and film as they might contain evidence of BASE jumping. They held that the fact that the films actually had to be reviewed at a later date to determine whether or not they actually contained videotapes of BASE jumping did not vitiate the probable cause for the seizure. In so holding, the Court stated as follows:

> The district court suppressed the videotapes and film on the ground that the rangers should have viewed them at the scene, rather than seizing them and then viewing them several days later. This ruling was error. The Supreme Court in United States v. Johns, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), refused to hold that police must immediately search all containers and packages discovered during a warrantless vehicle search. "This result would be of little benefit to the person whose property is searched, and where police officers are entitled to seize the container and continue to have probable cause to believe that it contains contraband, we do not think that delay in the execution of the warrantless search is necessarily unreasonable." Id. at 487, 105 S.Ct. at 886-87. The containers in Johns were plastic packages of marijuana, not videotapes and film, but the difference cuts entirely against Albers. Whereas the contents of most containers can be examined with relative ease at the scene, videotapes and film require specialized equipment and often take many hours to view. The justification for postponing examination is thus stronger for tapes and film than for ordinary closed containers.

United States v. Albers, 136 F.3d 670, 674 (9th Cir. 1997).

Based on the above law, the undersigned concludes that the videotape, the cell phone, and the gun were lawfully seized. In the case now at bar, the warrant to search the house and the vehicle authorized a search for the victim's bag and clothing, as well as ecstasy pills and crack cocaine. As to the videotape, the victim told Police Officer Tina Cook that she was kidnapped in Oklahoma, transported against her will to Missouri, forced to work as a prostitute in Missouri, and forced against her will to have sex with another female which said forced sex was videotaped by the Defendant on

a video camera.  As to how this videotaping was carried out, Officer Cook testified as follows as to what the victim told her:

> A.      . . .She stated there was a video camera.  She stated as you walked into the apartment to your right there would be a lamp and in the corner was a video camera, that the tape inside there contained evidence that she was on the videotape; that is, the camera that was used to record her against her will with another female having oral sex.
>
> Q.      And were there any other items described by Ms. Walker as being used in a similar fashion?
>
> A.      Yes, she also stated that Mr. Wilson recorded her on a cell phone video.

See Transcript of July 17, 2007 Hearing, pgs. 48, 49.

Cook also assisted in the execution of the search warrant and the seizure of the camera and the videotape.  In this regard, she testified as follows:

> Q.      Did you participate in the location of anything within the residence?
>
> A.      My main goal was, the first thing was the video camera to the right.
>
> Q.      And was it located in the space that Ms. Walker had described?
>
> A.      The exact spot, yes, ma'am.
>
> Q.      Did you believe  -- and as far as the video camera is concerned, was there anything inside the video camera?
>
> A.      There was an eight-millimeter tape, excuse me.
>
> Q.      And when you located the eight-millimeter tape inside the video camera, did you believe it was evidence of a crime when you saw it?
>
> A.      Yes, ma'am.
>
> Q.      And why was it that you believed it was evidence of a crime?
>
> A.      Due to the statement that Ms. Walker had just advised me of.

Q.      Okay.  Now did you have to review the contents of that eight-millimeter tape in order to believe that the tape was evidence of a crime?

A.      No, ma'am.

Q.      And why was that?

A.      Because during the statement Ms. Walker advised that there was sexual content on that video used with that video recorder.  And – of her and another female that she was being forced to have sex with.

Tr.  51, 52.

Given the above, the undersigned concludes that the camera and the videotape were lawfully seized pursuant to the plain view doctrine.  As in Khabeer, supra, the officers were searching for small objects, that being ecstasy pills and crack cocaine which could be concealed in very small areas of the house including boxes or even in a video camera.  As Officer Cook testified, immediately upon viewing the video camera lying on the floor of the apartment in the exact location which the victim described, she believed that the camera and the videotape inside of it were evidence of criminal activity.  Thus, the undersigned concludes that the officers came upon the video camera and tape during the course of the search of "a given area for specified objects."  See Horton v. California, supra, at 135.  That being the case, the undersigned concludes that the object was lawfully in plain view of the officers during the execution of the search warrant.  In addition, the undersigned concludes that upon initial viewing the video camera and videotape, it was immediately apparent that they were evidence of a crime because there was probable cause to seize both the camera and any videotape that was inside of it.  The officers had detailed information from the victim (including a description of the camera, the videotape and its location in the apartment) showing that the camera and the tape contained evidence of kidnapping as well as evidence of a minor being forced to engage in sexual acts.  Based on the above, the undersigned concludes that the facts available to the officers

19

in this case "would warrant belief that certain items may be useful as evidence." See Weinbender, supra, at 1331. Therefore, the undersigned concludes that in this case as in Texas v. Brown, supra, when the officers first viewed the camera and prior to even noticing that a tape was inside of it, they had "probable cause to associate the property with criminal activity." See Texas v. Brown, 460 U.S. 730, 741, 742. Thus, the undersigned concludes that the evidentiary value of the video camera and the videotape was immediately apparent and it was lawfully seized.

As to the gun, the Defendant does not seriously challenge the plain view seizure of this item. The testimony in this case is uncontroverted that an officer was searching Defendant's downstairs closet for drugs and was also aware at the same time that the Defendant kept a firearm in this area. He was interested in finding the firearm as well as the drugs because the officer was aware that the Defendant was a convicted felon and that it would be a crime for him to have possession of a gun. Before finding any drugs, the officer observed a loaded .380 caliber weapon in a shoe box. At this point, the undersigned concludes that the officer lawfully viewed the firearm while searching in an area in which drugs could be concealed. Further, the undersigned concludes that it was "immediately apparent" that the weapon was evidence of a felony crime of being a felon in possession of a firearm. Thus, the undersigned concludes that there was probable cause for the seizure at the point the officer observed the weapon. See Khabeer, supra; Texas v. Brown, supra; Weinbender, supra.

The undersigned also concludes that the seizure of the cellular telephone was lawful. As to the cellular telephone, the victim told the officers that the Defendant used his cellular telephone to photograph and to tape her having oral sex with a male. She said she was forced to be involved in this conduct by the Defendant. As to the discovery of the cellular telephone, the search warrant authorized the search of the Defendant's bronze or copper-colored Cadillac to look for or to search

for clothing of the Defendant as well as pills and crack cocaine. Assistant Chief Jones searched the Cadillac, and testified that when he opened the door in the front open area of the Cadillac he saw a cellular telephone laying on the seat of the car plugged into the charger. He recognized it to be a camera phone. He evidently observed this phone prior to searching any enclosed areas of the vehicle such as the glove compartment or the console, and prior to his full search of the vehicle for the other items. In doing so, the undersigned concludes he observed the cellular telephone in plain view while lawfully executing a search warrant to search and seize drugs and clothing. Jones stated as soon as he observed the cellular telephone, he believed it to contain evidence of criminal activity, that being the kidnapping charge as well as containing photographs of the victim in forced sexual encounters. When Jones picked up the phone, he either powered it on accidently or it came on as he picked it up and he noticed sexual or pornographic photos on the screen both on the outside of the phone and on the inside when he flipped it open. Given the above, the undersigned concludes that at the time Jones observed the cellular telephone, observed that it was a camera phone, observed that it was in the Defendant's vehicle, and combined this observation the statement of the victim that the Defendant had used his cellular telephone to photograph her in forced sexual encounters, the undersigned concludes that at the point he observed the phone he had probable cause to believe that it was evidence of criminal activity. Therefore, the undersigned concludes that its evidentiary value was "immediately apparent" and that the seizure of the phone was lawful.

The Defendant claimed that the seizure of the cellular telephone, the video camera, and the videotape was unlawful because their illegal nature was not immediately apparent. He cites Arizona v. Hicks, 480 U.S. 321 (1987) as authority for this proposition. In Arizona v.Hicks, however, the agents observed recording equipment during the course of a search warrant that they believed might

be stolen. They did not have probable cause to believe it was stolen until after they moved the equipment, recorded the serial numbers of the equipment, and made phone calls to determine that it was in fact stolen. The Court stated that the seizure of the equipment was not part of the plain view exception because at the time the equipment was viewed the officers were not aware that it was evidence of a crime or stolen property. It was only after the movement and the checking of the serial numbers that they became aware of this fact.

By contrast, in the case now at bar, the officers were aware at the time they viewed the video camera that it likely contained evidence of the crimes of kidnapping or forcing a minor to have sexual relations against her will. They had been informed of the exact location of the camera and videotape, the contents of the camera and the videotape, and had been so informed by the victim who had been filmed by the video camera and the cell phone. In other words, they had firsthand information that the camera, the videotape, and the cell phone contained evidence of a crime. Therefore, the undersigned concludes that the Defendant's argument must fail. In the case now at bar, unlike the case of Arizona v. Hicks, the officers had probable cause to believe that the camera, the videotape, and the cell phone were evidence of criminal activity. This probable cause was established when they first observed the camera, the tape and the phone prior to any playing of the videotape or manipulation of the cell phone. This is quite different from the evidence in Arizona v. Hicks.

The Defendant also argues that the officers could not be sure what was on the videotape until it was viewed later and could not be certain that the cell phone contained pictures of evidentiary value until it was powered up and opened. This, however, does not vitiate the validity of the seizure based on probable cause. As the Court held in Skokos v. Rhoades, supra, the seizure of the countertop video machines, based on the legal opinion of the prosecuting attorney was enough to show probable

22

cause that the countertop machines were evidence of a crime. The fact that they needed to be tested and viewed at a later date did not vitiate their seizure based on the information in the possession of the officers. Likewise, in United States v. Albers, supra, the fact that the videotapes of the BASE jumpers had to be viewed at a later date did not vitiate the probable cause to seize the tapes which likely held information of criminal activity, that being BASE jumping in the national park. Therefore, the undersigned concludes that the Defendant's argument must fail.[3]

### Conclusion

Therefore, based on the above, the motion to suppress evidence should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress [Doc. #37--dated 6/27/07] be **denied**.

Further, as to the motion to suppress, the parties are advised that they have until November 30, 2007, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

---

[3] As to the seizure of the Samsung video camera by Agent Stapleton pursuant to the Defendant's arrest, the Court stated as follows in Horton v. California:

> And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant.

Horton at 136. In this case, Stapleton arrested the Defendant pursuant to an arrest warrant and saw the video camera in plain view during a lawful arrest with a warrant. It was the exact same type of camera that the Defendant used to videotape a minor in forced sexual encounter and, thus, Stapleton had probable cause to seize it without a warrant.

_____
/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this _19th_ day of November, 2007.